Please be seated. Mr. Landau, would you mind going back to the council table for just a moment? I think, Mr. Fitzgerald, you owe us an explanation, and I'm not going to take it out of the government's time, so why don't you come and tell us what's going on? Yes, Your Honor, and I do want to apologize to all the members of the Court and to Defense Counsel for not being here at the appointed time. When the oral argument was set, the notice was sent out, and at that time the hearing was scheduled for today at 9 o'clock. I was aware of that. In fact, I had been planning a lengthy vacation, so I specifically noted it because I had to be back in the country for the hearing. While I was out, I received a memorandum from our appeals section that stated that the hearing would be tomorrow at 9 a.m. Because I was trying to read that on a BlackBerry, I contacted our appeals section to make sure that information was correct, because it did not accord with my recollection,  I did not go down and ask specifically to see what had caused the hearing to be changed, and I did not check with Defense Counsel to verify that the information I had subsequently received was correct, and certainly my failure to double-check that when I knew the hearing had been set on Thursday. I'd appreciate it if you could speak up a little bit. Yes, Your Honor. And again, it was my fault for not double-checking that the subsequent information I received about the hearing being tomorrow was correct. So as of 9 o'clock this morning, you had assumed that it was still set, erroneously, for tomorrow? That's correct, Your Honor. I assumed it was going to be at 9 o'clock tomorrow, and I was spending the morning meeting with a defense lawyer to make sure that it was set for tomorrow, and certainly I've already let our appeals section know that a mistake occurred, and obviously when I get back, I will work with them and make sure that an error like this does not occur again. As far as I'm aware, this case had never been up for resetting. It's always been set for today. Yes, Your Honor. And again, the mistake was entirely our mistake and my mistake for not double-checking. It was in no way the mistake of the court or defense counsel. All right. So you didn't know until you got the phone call from our deputy clerk? That's correct, Your Honor. All right, counsel, you can return to your counsel table, and we'll hear oral argument in the case of United States v. Collins. Counsel, you may proceed. May it please the Court, I'm Karen Landau. I represent the appellant, Wayne Collins. I'd like to reserve probably three minutes for rebuttal. Just watch the clock, Ms. Landau. I will watch the clock, Your Honor. Today I'll be discussing two of the issues presented in the brief, although I'd be happy to answer questions on any of the arguments presented. Whether the Brady violation, which was committed when the government withheld the tape that impeached both the testimony of the cooperating informant and the government's case agent, required a new trial. And second, I will be talking about the question of the prima facie case under Batson v. Kentucky. Over a period of months, the government repeatedly, and this was both pretrial and in many months of post-trial litigation, the government misrepresented the existence and availability of a tape recording between its informant, James Kim, who testified at the trial, and who the defense alleged had entrapped the defendant, and another target. Well, we're aware of the circumstances around all of that, but I think the legal issue that at least concerns me is the materiality of this tape. Why is it material? Why is there a Brady violation? Well, the tape is material because it would have provided valuable impeachment as to two important witnesses. First of all, as to the case agent. I'd like to point out that when a case agent testifies in a manner that's less than honest, it impugns the integrity of the government's entire case, and that is, in fact, what happened here. After James Kim testified, the case agent got on the stand, and she said, I listened to the tape last Saturday. This was on Monday, and the remarks in the report regarding threats were overstated, and she said that the tape, that while she didn't really, she talked a bit about the contents of the tape, but one thing she said is, I believe the informant was being truthful, that he didn't take the threat seriously. Now, of course, the defense didn't have the tape, so they had no way to impeach her. If they had had the tape, they could have shown that that was not correct, because the transcript of the tape reveals a clear threat. It was not from the target, but it was relayed. It's pretty incidental, isn't it? Your Honor. I'm just not sure even if you had the tape at that time what you could have done with it. Well, she could have, first of all, she could have impeached Kim. Well, again, back to the case agent. She could have impeached the case agent. And again, the case agent's credibility. With what? Because of the third-party threat? It would have, well, she would have impeached the agent regarding her testimony on the contents of the tape itself. So that's impeachment by contradiction. Second, the tape was useful to impeach James Kim, who after all got on the stand and denied that he had ever been threatened. Now, you might ask, why is that important? It's important because Kim's motive, Kim was obviously a motivated witness, but the government's case sought to minimize his motive either to entrap Collins or to falsify his testimony. Among other things, the case agent testified that she viewed Mr. Kim primarily as a source of information and only secondarily as somebody who was supposed to proactively set up drug deals in order to work off his Hawaii case. Now, this testimony is generously characterized as ingenuous. Kim was released on bond in order that he could proactively cooperate. So let's put that right up there. But the evidence, the state of the evidence was her saying, well, he was mostly a source of information. And he pretty much said the same thing. He said, I didn't have to work up a number of cases. I didn't have to produce a certain amount of cases. Now, that's true. I mean, his no cooperation agreement is going to say set up five drug dealers or you don't get a 5K1.1. But we know, people in the judicial system know, that the more successful an informant is in producing drugs, arrests, prosecutions, and convictions, the better result he's going to get in his subsequent sentencing proceeding. So his motive, he needed to set up people. He knew it. The government and everybody knew it except perhaps the jury. And the idea, in January, here he is. He's talking to this guy Martinez. And there's this reference to these threats as to somebody else who was obviously a potential target. That kind of threat is going to encourage him. I mean, I think if the defense had had the tape, they could have cross-examined and they would have been able to show, here is a motive that would have, it's a motive that's particular to why he might have tried to entrap Mr. Collins. And, you know, in fact, you know, the other evidence sort of, it was equivocal, but certainly a jury without that could have found, well, you know, they were friends. So why would he have gone out of his way to entrap this guy? You know, Collins and Kim, certainly Collins thought that Kim was his friend. And Kim testified, yeah, we had a friendship. You know, I took him out. I treated him. Now, of course, the thrust of the entrapment defense was that all of this was working on Mr. Collins. But the jury might have reasonably, you know, concluded without this evidence of motive that, in fact, you know, why would somebody entrap their friend unless they were already ready, It was also important here because Mr. Collins had a record. You know, I mean, I'm not going to dispute that. He had a record. But there was evidence, you know, ex-felons have a hard time. They have a hard time reentering society, getting legitimate employment. And so the evidence that Kim, you know, buttered him up and wooed him and offered him all these legitimate business opportunities was very important toward proving entrapment. The idea that Kim was also motivated because he was afraid of other targets would have materially bolstered the defense case. So that's why we think it's material. That's why it's material. Do you want to get to the Batson issue? I would like to talk about the Batson issue. Let me ask you a question about the Batson issue. This seems like, in many ways, a very unusual Batson claim. As nearly as I can tell, there were three African-American potential jurors, one of whom was struck by the defense. That was the first strike. One of whom the parties agreed should be excused for cause, and one of whom was struck by the prosecutor. That's pretty unusual. It's usually the prosecution and that's it. Is there anything to suggest that the trial court had to conclude that race was a factor when there's really only the bare fact that one out of the three African-Americans struck was struck by the prosecutor? There's really nothing else. Well, Your Honor, in fact, there are a couple of things, and some of them are subject or because of the appellate record. And some of them are – well, let me turn to your – Don't we judge it at the time that the district court ruled? Actually, we don't. We look at the whole record, the totality of the circumstances. And so this court can look at the record of the other jurors who were not struck by the government. And as I pointed out in my brief, there were several jurors who were substantially similar to the juror that was excused by the government. And both in terms of – for example, there was a single white male juror who also had no prior civil jury experience who had substantially similar answers to the questions about experience with drugs, the criminal justice system, those sorts of things. He was not excused. So, yes, I think this court needs – has to look, especially if this court is inclined not to find that there was a prima facie case, I think the court has to look at the appellate record. But, in fact, you know – It comes pretty close to saying that any time the prosecutor strikes an African-American juror, there's a prima facie case, which may not be the wrong answer. I mean, it's always a shock to me when trial judges don't ask for an exclamation. I mean, it's – Well, I think it's important here, though, Your Honor, because here counsel really – counsel, with all respect, Ms. Bednarski was an excellent trial attorney, and she made a very good record, and I am grateful to her for that. But she said, you know – I mean, first of all, the juror that the defense excused was pretty clearly somebody who was going to be excused, either for cause or by the defense, because she had personal experiences that really rendered her unfit to sit on this case. Her ex-husband was in jail for drugs. He had come out. He wasn't excused for cause. He was excused by the defense. You're correct. But what I was – but there was – as I recall, there may have been a challenge for cause that was denied. I may be wrong on that. I'm not sure either. I don't really remember. Okay. But she was clearly a juror who had serious issues, was not a good – you know, was not a fair juror for a drug case. I honestly don't recall the other juror who was excused by stipulation of the parties. It might have been one of the alternates later on. No, there was no other African-American seated. I know that, but I think there was someone excused for cause. There were three in the picture, one way or another. Okay. Well, regardless, I think, you know, what happened here is that it's difficult, but there is a case that holds – it held in the context of – it was two, but what we have here is the only remaining African-American was excused by the government. The government did not ask any particularized voir dire of this juror and did not attempt to ferret out any biases. That's a factor that this court can consider, and there's a case – it's Fernandez versus someone that says, you know, this is a piece of evidence that you can consider. So that's one thing, and certainly the trial judge was aware of that. Excuse me. I misspoke. There were two African-Americans who were selected as potential jurors. I was confusing the three that were compared. Sorry. Yeah, I believe – my understanding was that there were only two, but as I said, I could be – I may be misremembering the record. But anyway, the first juror, Ms. Hockenhull, was excused. She had a problem with drug cases. She had substantial personal experiences. And then we have Ms. Gossi, who really had fairly unremarkable responses, and the government exercised a peremptory against. Now, again, I would like to point out to this court that, in our view, the standard of review is de novo. And the reason the standard of review is de novo is because the judge plainly stated on the record, no pattern. Well, a pattern is not required. I would refer this court to the – I believe it's the Chinchilla case. And, of course, I don't have my opening brief up here with me. But in that case, there were actually two strikes. There was one of the – a panel member and also an alternate juror. The prosecutor struck both Hispanic jurors. And this court held you don't need a pattern. And, of course, after Johnson, it's clear you don't need a pattern. You look at the totality. So here I would say the totality includes we had only one African-American juror, we had an African-American defendant, and we have no particularized voir dire directed to that juror. Could I come back to one point? You said that the district court said that there was no pattern. And the court did, but it didn't stop there. Later in the discussion, the court came back to that ruling and said a lot more to say that none of the facts or relevant circumstances have raised any inference that the challenge was racially motivated. Your Honor, I may be mistaken, but I don't believe that he said that at the time. He may have said that in the motion for a new trial. Yes, I believe that's right. I don't think it's appropriate to consider that at this time because the judge made that statement after. First of all, Johnson was not decided before at the time this case, that the voir dire occurred in this case. The Johnson decision had not yet issued. And what the judge said at the time, I think, is controlling. What the judge said there was he said no pattern, no. And then counsel said, I'm objecting that it can't be a pattern because it's the only one left, referring to the African-American. And the court said, exercise your next challenge, counsel. So, you know, it's – there are – I did cite one case from the Third Circuit that's in a different context. It states, you know, it's not proper to rely on post hoc justifications, all due respect to the district court. I would like to point out one other thing, and this has to do with the Johnson case. Until Johnson, the Ninth Circuit had previously – as you may know, the California courts, from whence Judge Klossner had recently come to the district court bench, California had a different standard, which they held was substantially equivalent to Batson, but which the Supreme Court found was not substantially similar to Batson. And under the California case of Wheeler, a defendant had to show a strong likelihood that the preemptory challenges were motivated by a racial animus. And that standard actually had been interpreted to require sort of a preponderance of the evidence. That was required before a prima facie case was met. Well, the Ninth Circuit had issued a number of decisions saying, this is wrong, it's not the same. And finally, the Supreme Court took up the case and agreed. The Supreme Court made quite clear in Johnson that the standard for a prima facie case is low and that it doesn't require a preponderance of the evidence. And finally, that California's strong likelihood test is not equivalent to the reasonable inference that's required by Batson. So I certainly don't want to impugn the district court judge in any way, but I think there's a chance that he, you know, being relatively new to the federal bench, may have inadvertently been applying California's standard, especially since Johnson hadn't issued. If there's no more questions, I'll reserve the rest of my time. If I may do so, counsel. We'll hear from the government. May it please the Court. Your Honors, in regard to Introduce yourself for the record, please. Yes, Your Honor. Patrick Fitzgerald from the United States Attorney's Office. In regard to the Brady issue, while, as we stated in our brief and we stated in the court below, it's certainly unfortunate that the tape was turned over many months after we thought it had been turned over. Nonetheless, the issue is whether that admitted mistake requires a new trial. And for the reasons that we've set forth on the key issue of whether entrapment occurred, it's clear, as the district court found, that the existence of the tape at the trial would not have affected the entrapment. I think you need to respond to Ms. Landau's argument that the tape was material, it had impeachment value with respect to the contradiction and other aspects as well. Yes, Your Honor. In regard to the impeachment of the case agent, which was the first issue that was discussed, the tape, now once we finally got the transcript of it, I think it does not impeach what the case agent said at the trial. The case agent said she listened to the tape shortly before she testified, which is consistent with the tape actually being in existence. And her main point was that the threats were not something which the confidential informant took seriously, and that is consistent with what was on both the text of the tape itself and what both he and then the drug dealer he was talking to on the tape later said about the conversation. And again, this was, in looking at what the case agent said, this was in response to the defense counsel bringing it up on cross-examination and the case agent being very clear that she was giving her personal interpretation about what had occurred. So I think in that context, there's nothing in the actual transcript of the tape that would suggest that there was anything that would be of importance in impeaching a case agent. And similarly with Mr. Kim, the issue with Mr. Kim and impeachment first is, of course, that one of the issues on entrapment was predisposition, and the tape really had nothing to do with the government's case regarding Mr. Collins' predisposition. His prior felony for a serious cocaine trafficking offense, his ability to find methamphetamine once he got out of MDC, his relationship with Mr. Kim without telling his, which he admitted was a violation of his supervised release conditions, all of these were not affected in any way by the existence of the tape. On the issue of inducement, there was a logical connection that may or may not raise to the level of something under Rule 401, but even in regard to inducement, it was still very tangential. The thrust of the government's argument at trial, and what we argued in our closing argument, of course, was that the tears of Mr. Kim, as we referred to it, would not be enough to induce a law-abiding person to engage in the serious crimes that the defendant engaged in. And, of course, there was confirmation of that in the tape recordings that were made between the defendant and Mr. Kim, and in those tape recordings, which, again, we place a heavy emphasis at trial, the defendant made clear he was engaging in a large-scale methamphetamine deal for his own personal profit, and there was no discussion in those tapes of the so-called inducement and the friendship with Mr. Kim. So, again, the issue of what Mr. Kim's motive was or his further impeachment were not really the important issues at trial. In some ways, again, not in the investigation, but for trial, Mr. Areola was in loss, and then the defendant actually himself in many ways were the key witnesses for the government rather than Mr. Kim. And, of course, since Mr. Kim had been the C.I. in the case, his credibility and his impeachment was of some relevance, but for all the reasons we set forth in our brief on the Confrontation Clause issue, there was ample, ample impeachment of Mr. Kim that was presented to the jury. So since the tape, while, of course, once we said we were going to turn it over and we thought we turned it over, of course we should have turned it over, but that it was not turned over at trial really is not material, given the nature of the predisposition case that we had against the defendant and even the nature of the inducement case as it was argued and established at trial. In regard to the Batson issue, first, this is a case where a clear error standard of review applies. Well, the district court, I have two questions for you about this piece of the case. The first is, it is true that at the moment of the initial challenge, the court said no pattern, and that seemed to be the reason that the court was giving. So that's a legal mistake, isn't it? That's not the standard for a prima facie case. Well, yes, Your Honor, that's correct, but I believe that is best interpreted for a number of reasons, as the court giving a shorthand of the facts and circumstances it considered, and certainly an important fact, but not a legally decisive fact, was that there was no pattern, and certainly that was something that was appropriate for the district court to note. The district court did not say that as a matter of law or under established doctrine there had to be a pattern, and in fact Ms. Benarski brought up that under the current Ninth Circuit or the current legal standard was that a pattern was not required, and this court had made very clear that a strike of even one juror for improper reasons would, of course, be a violation. Which kind of leads me to my second question. I truly do not understand why, and maybe this is not even the proper question to ask you, but I don't understand why a district court would ever say, I don't want to hear the reason, or why the prosecutor would ever say, there's been no prima facie case, I don't want to give a reason. It just makes our job so much harder because if it looks like there's a prima facie case and a reason has to be given, it's two or three or five or more years later, and it goes back and it's impossible to figure out when at the time someone could simply say, you know, it's demeanor, the person looked at me really crossly when they came into the courtroom, or whatever, whatever the reason is. It doesn't have to be a smart reason. But I guess I just find it very frustrating, and I wonder if you'd comment on whether what the court did here was appropriate. Well, Your Honor, in part it was appropriate because I argue that a prima facie case had not been met, and for the reasons that Your Honor has mentioned, that in the future I might just go to the second step. But as of now, the Supreme Court has made a three-step process, and moreover... Certainly it has. I guess this is a pragmatic question more than a legal question, and maybe that's why it's the wrong question to ask in this context, but it certainly makes potentially more work for everybody. I understand that, Your Honor, and I think part of the reason, again, none of us are in a position to change what the Supreme Court has done, but the Supreme Court has ruled that if the government moves immediately to the second step, then it doesn't matter whether a prima facie case was made in the first step. We immediately go to the second step. And this may have been a mistake on my part, but certainly as an advocate you always think, well, why should I give up my first of its three steps? Why should I automatically go to the second step if we haven't even done the first step? In the real world, it may be that that's not such a good way to look at it. What's your specific response to counsel's argument that the struck juror, except for race, looked exactly like one other juror, or at least who was retained? Your Honor, counsel's talking to the juror, well, a number of responses. One, of course, although a comparative analysis does have some weight, even on the first step, obviously there are, and this is what makes it difficult for this Court, as Your Honor has noted, there's always going to be factors that are not in the record. So to a certain extent, at this first stage, this Court is relying on the district court. But all we have is the record. And if on the record this struck juror looks like every other juror, that's the whole point of having the explanation at the time. You know, this one smiled at me and that one frowned at me, but we can't tell that because there's no record of that. Well, yes, Your Honor, but the district court could tell it. And, again, that's part of the reason that we're... It's not the reason that it gave. It gave no pattern reason. Well, Your Honor, it mentioned one reason, but I would submit that it was taking into account everything that it was seeing going on in front of it. And if there had been a juror who was more problematic, that the Court might well have ruled differently. And, of course, that's explicitly what the Court said when this issue was raised, the motion for reconsideration. Second, I think if one looks closely at the other jurors who were struck or not struck, there is not someone who is as close as defense counsel suggests to the juror whom the government struck. And I think, actually, in some ways the potential juror who was closest was the juror whom we struck first. The juror who was the subject of the Batson challenge was challenged on the... If I recall, that was prospective juror number 11. She lived in Venice. She was a medical secretary. No other adults were living in her household. She was very similar to prospective juror number 9 who we struck. So I would suggest that one is making the comparative analysis. There's nothing inconsistent or being an outlier in regard to our striking juror number 9. Also, just so the record is clear in response to the earlier questions the members of the Court had, there were three whom the people in the courtroom perceived to be African-American prospective jurors. Two were for the jury panel. One was for the alternate. And then it was the alternate. And we did agree that he should be struck for cause. So that was the record in regard to that. And also in regard to Johnson. Johnson came down during the trial, but after the voir dire and the jury selection had occurred, because I remember reading it during the trial. And I think what's significant about Johnson is that it did adopt the current Ninth Circuit standards. So this is not a situation like the California cases, in which a trial court may have applied a standard that was then overruled by the Supreme Court. For purposes of the district courts in this circuit, Johnson did not change the law. And therefore, the suggestion that somehow Judge Klausner was not following the law and Johnson changed it I do not think is a correct interpretation. Under the law that clearly existed at the time we had the voir dire in this case, a pattern was not required. And there's no reason to think that the district court was not applying the proper standard. And then, of course, furthermore, the district court quite explicitly on the record stated that it had considered all the factors when it made its ruling. And, in fact- Can we look at that later statement as informing the original statement? I think so, Your Honor, because in contrast to the case that was cited in the defendant's reply brief, this is not a district court speculating about what it would have done in an alternative hypothesis. For example, well, even if this evidence had been brought in, I wouldn't have ruled differently. Obviously, the court would say, well, who knows? Let's go back and do it over again. Here there was a direct question about what standard the court had applied. And the court said, no, I applied the correct standard. And if a prima facie case were to exist in this situation, it would really exist any time the government strikes a member of a minority group. And I just don't think that's the law. And I think the district court was correct on that. So I think in this situation, when it's not the district court hypothesizing about what it would have done, but the district court stating it had a chance to make a more fulsome record than all of us huddled over on sidebar while we're picking the jury, I think we can take that statement of the district court as to what it did and what standard it applied as something that is accurate. Anything further, counsel? Your Honor, I don't know if the members of the court have any questions on either the confrontation clause issue or the witness who or potential witness who was in Hawaii. And, of course, I'll be happy to answer any on those topics. But if not, I'll just once again, on behalf of myself personally for my mistakes and on behalf of the office, apologize to the court. I don't think I've ever been late for a hearing, and I certainly never dreamed it would be a Ninth Circuit argument. We understand, counsel. Thank you. Thank you very much. Ms. Landau, you have some reserve time. I wanted to address a couple of points. So, you know, the government has argued that the tape would not have impeached the case agent because she really testified as to her personal opinion. Well, I'd like to refer to some of the tape transcript. So this is an excerpt of record 357 where Martinez is exhorting Kim. And, for example, Martinez says, have you talked to them? And Kim says, no, no, I haven't talked to him. Martinez says, don't, don't. Kim says, yeah, because I think you know my liquor store, my brother's liquor store. Kim says, I think one lady come down to try to meet me. So it's clear that Kim is aware that there's someone looking for him. Later, shortly, on excerpt of record 358, Martinez says, bro, you have no idea. And Kim says, I don't want to meet them, man. I don't want to meet them. These indicate that Kim took the threat seriously. And so the agents, so the tape, as I said, would have impeached both Kim's testimony that he'd never been threatened and the agent's testimony about her interpretation of what Kim believed. I also wanted to address, you know, the government has argued in its brief in here that Kim was really not important to the government's case. Kim was, well, first of all, that point doesn't go to the case agent. The case agent clearly was important to the government's case. Second of all, Kim was critical because he was needed to establish the whole frame of reference. He was important to the entrapment case. And evidence that impeached him, you know, you don't evaluate impeachment evidence by looking at whether the government otherwise presented sufficient evidence to convict. That point was rejected by the Supreme Court in Kyles v. Whitley and reiterated by this court in its en banc decision in Jernigan. So the fact that the government may have had sufficient evidence to convict Mr. Collins and the fact that they had a case for predisposition doesn't negate the notion that the evidence was material and could have resulted, you know, there's a reasonable probability that a jury could have reached a different result. On Fasten, you know, we have to rely on what the judge said at the time. And what the judge said was clear, no pattern. I mean, that's what the judge said. That's the best evidence of the rule of law he applied. Even if you apply the clear error standard, however, I think reversal is required. And that's because when you look at the appellate record, you have a number of jurors with substantial similarities to the juror who was excused. What's your response to the argument that this juror also had substantial similarities to others who were excused? Well, you know, the government has pointed to one juror, and I don't recall that that argument was raised in its answering brief. You're asking us to review it de novo, and you're giving us ones to compare with. You're right. I guess I would say that, again, you know, I don't think the record is sufficient to uphold the district court's ruling. You know, the government said, I mean, in its answering brief, the government offered a lot of reasons why the jurors that I pointed to were different. He said, well, this one had civil jury experience, and this one was married, and Ms. Goese was single. You know, I mean, by the government's argument, Ms. Goese was still similar to Mike McGee, who was a white male juror, single. Well, let's suppose there were ten jurors who, on the record, all looked more or less identical, and five of them were struck, and five of them were left on the jury, and one of the five that was struck was African-American, and everybody else, all nine, were white, or at least non-African-American, as far as we can tell. What do we make of that on a prima facie case if the district court says, look, I'm sitting here, and no explanation. It just says, no, overruled, no prima facie case. What are we supposed to do with that? Well, in that, okay, well, I think it's a problem, because I think when you can point, when the moving party, first of all, you have one factor right there, that you have an excused juror who was of the same race as the defendant. So while that may not be enough, I think when you add in the record that shows that similar or identically, you know, well, no two people are identical, but people who are substantially similar were kept on the jury, that's enough for a prima facie case, especially in the situation where, in many federal juries. And it's not dissipated in my example by the fact that a whole lot of people who were similar also were struck. No, I don't think so. I don't think it is, because we pay special attention to immutable characteristics like race or gender. The federal courts, you know, the Supreme Court has said as a policy, we don't want prosecutors excusing people based on gender or race or national origin. We don't, you know, if the government had stepped up and said, well, you know, I excuse, I mean, well, by way of example, you know, the government points to this other juror who lived in Venice, and Ms. Goese lived in, I believe it was Compton. I mean, one of the things that this court has noted is that residence is often a marker for race. I'm not disputing that the government, that the other juror they pointed to was, you know, was not black. But when, you know, if anything, that raises more, I mean, excusing somebody from Venice and excusing from Compton, somebody from Compton, it's, I mean, it's a little suspicious. What is that? I know you're past time, but I'm not from California. I don't know what any of this means. Okay, well, Venice and Compton are primarily African-American neighborhoods. They are poorer. Compton is a neighborhood that was almost entirely African-American. It is now partly Hispanic, partly African-American. And Venice has always had a large African-American component. And, you know, so anyway, I mean, that's, I mean, I don't have the best. I think we understand your argument. I understand my argument. Yes, very well. The case just argued will be submitted for decision, and the court will adjourn.
judges: O'scannlain, Graber, Gibson